IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DARRYL SIMPSON, | ) | CASE NO. 1:16-cv-00314 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Darryl Simpson ("Plaintiff" or "Simpson") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has

been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

Simpson filed applications for DIB and SSI in June 2012.  Tr. 27, 77, 86, 100-101, 194-

200.  He alleged a disability onset date of July 1, 2008.[1]  (Tr. 27, 77, 86, 194, 211), and alleged

disability due to depression, anxiety, heart problems, carpal tunnel, and back injury (Tr. 77, 86,

---

[1] Simpson was born in 1960 (Tr. 51) and therefore turned 50 years of age in 2010.  During the administrative
hearing, Simpson's counsel stated that consideration had been given to amending the alleged onset date to
Simpson's 50th birthday.  Tr. 54.  The Administrative Law Judge ("ALJ") said that such an amendment would
require dismissal of Simpson's Title II (DIB) claim, which the ALJ was not willing to do.  Tr. 54.

128, 132, 144, 150, 215).  After initial denial by the state agency (Tr. 128-141) and denial upon

reconsideration (Tr. 144-154), Simpson requested a hearing (Tr. 155-156).  A hearing was held

before ALJ Judge George D. Roscoe on August 7, 2014.  Tr. 47-76.

In his September 8, 2014, decision (Tr. 24-46), the ALJ determined that Simpson had not

been under a disability from July 1, 2008, through the date of the decision.  Tr. 27, 42.  Simpson

requested review of the ALJ's decision by the Appeals Council.  Tr. 21-23.  On December 30,

2015, the Appeals Council denied Simpson's request for review, making the ALJ's decision the

final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Simpson was born in 1960.   Tr. 41, 51, 194, 211.  At the time of the hearing, Simpson

was 54 years old and married.  Tr. 51.   Simpson and his wife lived alone in their home.  Tr. 51.

Simpson attended school until the 10th grade.  Tr. 53.  He is able to read and write and perform

simple math.  Tr. 53.   Simpson had worked as a dietary aide in a hospital.  Tr. 53.  That job

involved putting designated items on plates for patients, loading the plates onto carts, hooking

the carts up to a mobile cart, and driving them to another section of the hospital to deliver to

patients in their rooms.  Tr. 53-54.

### B.    Medical evidence[2]

#### 1.    Treatment records

Simpson generally received medical treatment from the Veteran's Administration (VA)

hospital.  On June 25, 2008, Simpson was seen at the VA emergency room with complaints of

dizziness and left hand numbness.  Tr. 312.  Simpson's dizziness had occurred while he was at

---

[2] Simpson's arguments pertain to the ALJ's consideration of his alleged physical, as opposed to mental, impairments.  Accordingly, the evidence summarized herein his related primarily to Simpson's alleged physical impairments.

work.  Tr. 312.  He did not fall or lose consciousness.  Tr. 312.  Simpson had a history of

hypertension, depression and cocaine use.  Tr. 312.  He had been on blood pressure medication

but had not taken his medication for 6-7 months because he had been feeling good.  Tr. 312.

Simpson reported that his hand numbness had been present for about 2 weeks.  Tr. 312.  On

examination, there was no wheezing or crackles in the chest.  Tr. 312.  There was trace lower

extremity edema.  Tr. 312.  The emergency room physician re-filled Simpson's blood pressure

medications, recommended that Simpson follow up in 1-2 weeks for a blood pressure check, and

ordered a wrist splint for his carpal tunnel syndrome.  Tr. 313.

On July 31, 2008, Simpson was at the VA emergency room for a nagging cough that had

been present for one and a half weeks.  Tr. 305, 308.   Simpson also complained of a clear nasal

discharge and itchy eyes.  Tr. 305.  He was continuing to smoke 3-5 cigarettes each day.  Tr.

305.   A chest x-ray indicated that Simpson's cough might be due to poor inspiratory effort but

mild cardiomegaly and mild pulmonary congestion could not be entirely excluded.  Tr. 306.  The

assessment at discharge was that Simpson was obese with a history of hypertension and his

cough was likely due to allergic rhinitis.  Tr. 303, 306-307.  Simpson was discharged home with

instructions to follow up with his primary care physician and have a repeat chest x-ray in about

3-6 months.  Tr. 306-307.   In August 2008, Simpson was seen at the VA emergency room

because his right ear was clogged and, in October 2008, Simpson was seen for a sore throat/viral

upper respiratory infection.  Tr. 294-298, 300-301.

On January 9, 2009, Simpson saw his nurse practitioner Mirna Carias.  Tr. 515-519.

Simpson complained of multiple problems.  Tr. 516.  He was only taking his blood pressure

medication when he remembered to do so.  Tr. 516.  He was snoring at night and waking up

gagging.  Tr. 516.  He also reported feeling tired and getting short of breath easily.  Tr. 516.

Simpson also reported neck and shoulder pain and numbness in his left hand.  Tr. 516.  Simpson weighed 345 lbs.  Tr. 517.  Nurse Carias adjusted Simpson's medication to help improve his hypertension and counseled Simpson regarding the importance of taking his prescribed medication.  Tr. 517-518.  Simpson relayed that he was too busy during the day so MOVE, a weight management program, would not be good for his schedule.  Tr. 517.  Nurse Carias suspected that Simpson's obesity was the cause of his shortness of breath.  Tr. 517.  She suspected that sleep apnea was the cause of his sleep problems.  Tr. 517.  She advised Simpson to stop smoking and offered him referrals and medication to assist with quitting.  Tr. 518-519.

On July 30, 2010, Simpson saw Nurse Carias.  Tr. 512-514.  Simpson reported that he was not happy with himself.  Tr. 513.  He had been unable to find a job for over a year and he had been having marital problems.  Tr. 513.  He had not been taking his blood pressure medication.  Tr. 513.  Simpson reported getting headaches when taking his medication.  Tr. 513, 514.  Some adjustments were made to Simpson's blood pressure medications.  Tr. 514.  On examination, Simpson had no edema in his extremities.  Tr. 513.  Simpson was agreeable to participating in a weight management program and mental health treatment.  Tr. 513.  Simpson was smoking 3-4 cigarettes each day and reported last using cocaine three years prior.  Tr. 513.  On August 12, 2010, Simpson was referred for a MOVE weight management consultation.  Tr. 511.

On January 4, 2011, Simpson was seen at the VA emergency room for cough and congestion and right eye pain with drainage.  Tr. 288-294.  Simpson had quit taking his blood pressure medication.  Tr. 288.  He denied shortness of breath.  Tr. 288.  Simpson did not show signs of gait or balance abnormality.  Tr. 294.  Simpson was discharged that same day with

instructions to follow up with his primary care physician as well as the eye clinic.  Tr. 289-290.
Simpson did not show for a February 10, 2011, optometry appointment.  Tr. 288.

In September 2011, Simpson was seen at University Hospital's emergency room with
reports of flank pain.  Tr. 380-381.  Simpson reported having right flank pain for three days that
was worse with inspiration and movement and that radiated towards the right lower quadrant.
Tr. 380.  Simpson also reported numbness in his left fingers and left flank pain.  Tr. 380.  He
denied shortness of breath or motor deficits.  Tr. 380.  The emergency room personnel observed
that Simpson was obese and in no acute distress.  Tr. 381.  His lungs were clear to auscultation
bilaterally; there was no wheezing or crackles.  Tr. 381.   With respect to Simpson's extremities,
it was noted: "Lower extremities were well perfused, 1+ pedal edema.  Distal pulses 1+
bilaterally."  Tr. 381.   Simpson was diagnosed with musculoskeletal back pain.  Tr. 381.  He
was treated with Toradol and morphine and the pain improved.  Tr. 381.  He was prescribed
Flexeril and Motrin and advised to return if the pain persisted or if he developed new symptoms.
Tr. 381.

On June 19, 2012, Simpson was admitted to the VA emergency room with complaints of
a cough and congestion, neck pain, and dyspnea.  Tr. 275-287.  Simpson indicated that the
shortness of breath had been going on for a year.  Tr. 275.   His shortness of breath occurred with
exertion, such as walking from the garage to the emergency department.  Tr. 275.  Also, when
sleeping, he indicated that he wakes up gasping for air.  Tr. 275.  On examination, Simpson was
in no acute distress; he was severely obese; wheezing and scattered rhonchi were noted; he had a
regular heart rate and rhythm and there were no murmurs/rubs/gallops; his extremities were non-
tender; he had a full range of motion; and there was no pedal edema.  Tr. 282.  Also, during his
visit, Simpson did not exhibit signs of gait or balance abnormality.  Tr. 287.   A chest x-ray

showed multiple bilateral lung nodules and Simpson was admitted for further evaluation of the nodules. Tr. 276, 282. A PET scan showed no evidence of malignancy. Tr. 276. Simpson was also admitted for evaluation and control of his blood pressure. Tr. 276, 284. Simpson reported being out of blood pressure medication for about 5 months. Tr. 287. He was administered various medications, including an albuterol/ipratropium nebulizer solution and amlodipine. Tr. 278-279, 285. While admitted, Simpson maintained good blood pressure. Tr. 276. Simpson was discharged on June 21, 2012. Tr. 275, 469-476. At discharge, there were no limitations with respect to employability noted. Tr. 474.

Simpson saw Nurse Carias on August 3, 2012. Tr. 347-350. Simpson relayed that he had been very stressed and had not been to see Nurse Carias since July 2010. Tr. 348. Simpson indicated that everything was wrong in his life and stated he felt horrible. Tr. 348. His mother and step-daughter had died since he had last seen Nurse Carias. Tr. 348. Simpson reported being short of breath, indicating he could not walk one block without having to stop to catch his breath. Tr. 348, 349. He was smoking a 1/2 pack of cigarettes each day; he had gained about 100 pounds since 2004; and his blood pressure had been high. Tr. 348. Nurse Carias adjusted Simpson's blood pressure medication; recommended mental health therapy and a sleep clinic evaluation; and Simpson agreed to participation in the MOVE program. Tr. 350.

On August 24, 2012, Simpson was seen for an evaluation of his sleep related problems. Tr. 360-361. The pulmonary department concluded that it was likely that Simpson had obstructive sleep apnea based on evidence of snoring and apneas and his elevated BMI. Tr. 361. A sleep study was recommended and Flonase was ordered. Tr. 361.

During a September 2012 visit with Nurse Carias, Simpson relayed that he was working hard to change his life style; he was taking his medication daily; he was frustrated with his

weight; he was skeptical about referrals to a nutritionist but agreed to see a nutritionist.  Tr. 442-446.  Simpson had joined the choir at church and had seen someone in psychiatry.  Tr. 444.

Nurse Carias increased some of Simpson's hypertension medication; encouraged him to continue to see someone for mental health treatment due to his depression; referred Simpson to a nutritionist; and started Simpson on naproxen for pain in his finger.  Tr. 446.  Also, she recommended follow up in the sleep clinic regarding his sleep disorder.  Tr. 446.  Nurse Carias noted that Simpson's shortness of breath was likely caused by his body habitus.[3]  Tr. 446.

On November 6, 2012, Simpson was seen for a nutrition outpatient assessment.  Tr. 418-424.  Simpson weighed 369.5 lbs. and he was 5'7" tall.  Tr. 418.  Simpson's last recorded weight was 366.8 lbs (9/20/2012).  Tr. 424.  Simpson explained that he dealt with stress by eating.  Tr. 419.  He reported trying to exercise but explained that he gets short of breath and has pain, which Simpson attributed to his weight.  Tr. 419.   Simpson was walking his grandchildren to nursery school and back 4-5 times a week, two times each day.  Tr. 420.  In doing so, he felt pain and became short of breath.  Tr. 420.  Simpson indicated he wanted to lose 100 pounds.  Tr. 419.  He denied alcohol use but indicated that he smoked 4-5 cigarettes each day.  Tr. 419-420.  Simpson was referred to MOVE.  Tr. 424.

During a mental health appointment on December 4, 2012, Simpson relayed a number of things, including that he did not call to cancel appointments, did not attend MOVE, and did not attend AA, and asked if that conduct would get him a pension.  Tr. 573.   He also indicated that he had applied for SSD, was getting food stamps, and was working odd jobs for money "under the table."  Tr. 577.

---

[3] Habitus means: "1. posture or position of the body. 2. physique; body build and constitution."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 815.

During December 14, 2012, mental health appointments, Simpson reported that he was using his CPAP machine and felt a difference in his alertness when he used his CPAP machine. Tr. 567, 568.  Simpson felt that he should be provided with bus tickets and travel money.  Tr. 568.  He felt that his missing appointments and not having money was the VA's faults.  Tr. 568. He was confronted about blaming others for things and, when confronted, Simpson became quieter and more cooperative.  Tr. 568.  Simpson also relayed that he was stressed out a lot with taking care of two young grandchildren.  Tr. 571.  He reported getting aggravated and angry at times.  Tr. 571.  He indicated he had taken his blood pressure medication that day but did not always take it at the same time.  Tr. 571.

During a mental health appointment a few days later on December 18, 2012, Simpson reported having a hard time getting used to wearing his CPAP machine and was still not sleeping well. Tr. 566.  He indicated that he was able to make the December 18, 2012, appointment because he had coordinated his appointment with a friend and was able to get a ride from his friend.  Tr. 567.  He was interested in resuming mental health therapy but could not make a consistent commitment due to transportation issues but stated he would try to get a ride with his friend.  Tr. 567.

On December 21, 2012, Simpson attended a MOVE class.  Tr. 565-566.  Class topics included the benefits of regular aerobic exercise and resistance exercise.  Tr. 565.  Strength training exercises were performed as a group.  Tr. 565.  Simpson also attended a MOVE class on January 4, 2013, that involved educational instruction.  Tr. 564-565.

Following an emergency room visit for dizziness (Tr. 752-755, 756-759, 761-764), Simpson saw Nurse Carias on May 21, 2013.  Tr. 743-747.   The day before becoming dizzy, Simpson had had teeth pulled and had been having a hard time eating.  Tr. 745, 756.  He became

8

dizzy while attending a group meeting and was advised to go to the emergency room.  Tr. 745.

Nurse Carias observed that Simpson was very sleepy during the visit and inquired about

Simpson's use of the CPAP machine.  Tr. 745.  Simpson responded, "you expect me to wear that

big mask at night – I am not going to do it -."  Tr. 745.  Nurse Carias reminded him of the need

to wear the CPAP.  Tr. 745.  On examination, Nurse Carias observed no wheezing and mild

lower extremity edema bilaterally.  Tr. 746.

On July 12, 2013, Simpson was seen for a cardiology consult due to shortness of breath

on exertion.  Tr. 688-691.  Simpson admitted to forgetting to take his blood pressure medication

that morning.  Tr. 689, 690.  Simpson had mild bilateral leg swelling.  Tr. 689.  He reported

multiple apnea episodes at night and reported feeling more tired and short of breath the following

day.  Tr. 689.  On examination, the cardiologist observed mild pitting edema up to 2/3 of

Simpson's lower legs.  Tr. 689.  The cardiologist prescribed some new medication and strongly

encouraged Simpson to lose weight, be compliant with medications, follow a low salt and low

cholesterol diet and be compliant with use of the CPAP machine.  Tr. 690.  It was also

recommended that Simpson follow up with pulmonary and check his blood pressure at home and

bring those records to the next appointment in 3-4 weeks.  Tr. 690.

In January 2014, Simpson reported doing a lot of walking and acknowledged that it

would take time to lose all the weight he had gained over the years.  Tr. 671.  Simpson also

reported being down to smoking only 2-3 cigarettes each day.  Tr. 671.

On January 22, 2014, a chest CT was performed with a comparison made to the June 19,

2012, studies.  Tr. 641-642.  The January 22, 2014, chest CT showed multiple pulmonary

nodules but the majority had remained stable in size.  Tr. 642.  A follow-up chest CT was

recommended in 3-6 months.  Tr. 642.

On February 24, 2014, Simpson was seen for a pulmonary diagnostic study consult due to the nodules first identified on the chest x-ray from June 2012 and later appearing more prominent on the January 2014 chest CT. Tr. 658-662. Simpson reported dyspnea and that he was involved in an aggressive weight loss program, having lost 6 pounds. Tr. 659. He reported that the CPAP was working well for him. Tr. 659. On examination, no obvious dyspnea or coughing was observed and Simpson's lungs were clear. Tr. 661. Trace bilateral lower extremity edema was noted. Tr. 661. Nurse Practitioner Byschelle Jesberger's assessment was that Simpson was a morbidly obese smoker who presented with multiple lung nodules and dyspnea. Tr. 662. She noted that the dyspnea was likely multifactorial but since Simpson had shown improvement with albuterol, she recommended trying symbicort and formal pulmonary function testing. Tr. 661. Nurse Jesberger also noted that "[t]his may all be related to obesity/deconditioning." Tr. 661.

During a telephone discussion with one of his mental health providers on March 3, 2014, Simpson relayed that he had been watching his food intake and had increased his walking and had walked four blocks that morning. Tr. 654.

During medical appointments in June 2014 (Tr. 647-652, 658) Simpson explained that he had been very busy taking care of his brother who, like him, had a lot of problems. Tr. 649, 658. As a result of being busy caring for his brother, Simpson had missed many appointments for mental health counseling, cardiology and pulmonary. Tr. 649, 658. He stated he wanted to return to seeing those providers. Tr. 649. Simpson's social worker indicated that Simpson's brother would be eligible for home care services, which would alleviate some of the burden on Simpson. Tr. 658.

During his June 2014 visit with Nurse Carias, Simpson reported that he was not using his CPAP machine every night.  Tr. 649.  He was only using it if he could not breathe.  Tr.  649.

During a July 16, 2014, personalized health plan follow-up appointment, Simpson reported that his leg had been giving out and that he had blacked out earlier in the week.  Tr. 644.  Mr. Penny, a peer support specialist, stressed to Simpson the importance of making his appointments and weight loss.  Tr. 644.  Simpson stated he would think about participating in the MOVE program again.  Tr. 644.   Nurse Palmieri followed up with Simpson on July 17, 2014, regarding the reported "black out."  Tr. 644-645.  Simpson explained that, before blacking out, he was in the kitchen and started to feel lightheaded and his vision was blurry.  Tr. 645.  He denied hitting his head or having other injuries and stated that he was checking his blood pressure regularly and it was always in the 140-150 range.  Tr. 645.  Nurse Palmieri also talked with Simpson about the many missed appointments.  Tr. 645.   Simpson indicated that he had trouble making his appointments because he could not afford the bus.  Tr. 645.  Nurse Palmieri noted, however, that, when Simpson had asked about a consult for ortho, she reminded him that he would need to transportation to attend those appointments and Simpson responded "well I will find a way to make those appointments."  Tr. 645.

## 2.     Opinion evidence

### a.     Consultative examining  physician

On October 19, 2012, Edward Butler, M.D., saw Simpson for a consultative internal medicine examination.  Tr. 400-409.   On examination, Dr. Butler observed that Simpson had a slight antalgic gait on the left side; he could walk on heels and toes without difficulty; he could do a full squat; his stance was normal; he did not need help changing for the examination[4] or

---

[4] Simpson also reported to Dr. Butler that he was able to shower and dress himself.  Tr. 402.  Simpson was seen by Kathleen M. Payne, Ph.D., for a consultative psychological examination on the same day that he saw Dr. Butler.  Tr.

getting on and off the exam table; and he was able to rise from a chair without difficulty.  Tr. 402.  Simpson's lungs were clear to auscultation; percussion was normal; there was no significant chest wall abnormality; and there was normal diaphragmatic motion.  Tr. 403.  Dr. Butler observed no cyanosis, clubbing or edema in Simpson's extremities.  Tr. 403.  Dr. Butler noted that deep tendon reflexes were absent in the legs (Tr. 403) and Simpson had a decreased range of motion in his lumbar spine (Tr. 408).  Straight leg raise was negative bilaterally (Tr. 403) and all other range of motion testing and manual muscle testing was normal (Tr. 406-409).

Dr. Butler noted diagnoses of lumbar sprain; pain at the left ankle (etiology undetermined); triggering of the left middle finger; pain at the left upper extremity (etiology undetermined); asthma; hypertension – uncontrolled; history of borderline diabetes mellitus; morbid obesity; sleep apnea; drug abuse; left-sided chest pain (etiology undetermined); smoking abuse; and recent laceration to the base of the right little finger.  Tr. 404.  He concluded that Simpson's prognosis was guarded and opined that Simpson should avoid respiratory irritants and there were mild limitations with pushing, pulling and lifting.  Tr. 404.

**b.     State agency reviewing physician**

On December 15, 2012, state agency reviewing physician Leslie Green, M.D., reviewed the record, including Dr. Butler's consultative opinion, and completed a physical RFC assessment.  Tr. 90-96.  Dr. Green opined that Simpson had the following exertional limitations: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit more than 6 hours in an 8-hour workday; and push and/or pull unlimitedly, other than as indicated for lift and/or carry.  Tr. 94.  Dr. Green opined that Simpson had the following postural limitations: never climb ladders/ropes/scaffolds; occasionally climb

---

389-397. In that examination, Simpson told Dr. Payne that he could dress, bathe and groom himself but needed assistance putting on socks and tying his shoes.  Tr. 393.  Also, he reported that he needed assistance using the restroom.  Tr. 393.

ramps/stair; occasionally kneel, crouch, and crawl; and frequently stoop.[5]  Tr. 94.  Dr. Green explained that the postural limitations were due to Simpson's shortness of breath, obesity and pain.  Tr. 94.  Dr. Green opined that Simpson had the following environmental limitations: avoid concentrated exposures to extreme cold, heat, humidity; and fumes, odors, dusts, gases, poor ventilation, etc.; and avoid even moderate exposure to hazards (machinery, heights, etc.).  Tr. 95. In explaining the environmental limitations, Dr. Green stated that Simpson had a history of recent pulmonary nodules, he was obese, he had a significant history of using cocaine (with recent use), and non-compliance with blood pressure medication.  Tr. 95.

In further explaining her RFC, Dr. Green noted that pulmonary function studies might have been helpful but they could not be obtained because of Simpson's high blood pressure.  Tr. 95.  In any event, Dr. Green concluded that she did not think that pulmonary function studies would change the limitations in the RFC significantly and took into account Simpson's high blood pressure as well as other conditions in formulating Simpson's RFC.  Tr. 95.

Dr. Green found no manipulative, visual, or communicative limitations.  Tr. 94-95.

## C.    Hearing testimony

### 1.    Plaintiff's testimony

Simpson testified and was represented at the hearing.  Tr.  50-68.  Simpson was 5 feet, 7 ½ inches tall and weighed 394.7 pounds.  Tr. 51.  He had lost about 14 pounds in the 6 months prior to the hearing.  Tr. 51.

Simpson has driven but never legally because he has never had a driver's license.  Tr. 52-53.  He took a bus to get to the hearing.  Tr. 53.  Simpson's grandchildren come over on weekends.  Tr. 52.

---

[5] Dr. Green opined that Simpson could balance unlimitedly.  Tr. 94.

Simpson indicated that he was unable to work because of his breathing, inability to stand for long periods of time, back pain, and his hands.  Tr. 54.

Simpson indicated that his back pain was centered in the middle of his back, with the pain extending down into his legs making him unable to stand or walk.  Tr. 56.  Simpson's medication helps with his pain.  Tr. 55.  However, his medication causes headaches.  Tr. 55, 63-64.  He gets migraines.  Tr. 64.  The headaches last about 2-3 hours and he has to sit still or lie down to keep his head from throbbing.  Tr. 64.  Simpson thought his doctor had changed his medication to help prevent migraines.  Tr. 64.  Simpson was not undergoing physical therapy; did not use a back brace, cane or crutches; did not use a TENS unit; and had not had any recent surgery.  Tr. 56.  Simpson was treated by a doctor at the VA about once a month.  Tr. 56.

During the hearing, Simpson estimated being able to walk about half a block.  Tr. 57. Later in the hearing, the ALJ asked Simpson about a treatment record wherein it was noted that Simpson had done a lot of walking and inquired as to where Simpson walked.  Tr. 68.  Simpson stated he walks from his house about two blocks to the nursery school where his grandkids attend; he rests; and then walks back to the house.  Tr. 68.  He stated that, after walking about half a block, he has to stop because he gets out of breath.  Tr. 65.  Simpson has inhalers that he uses.  Tr. 65.  One inhaler is for daily use and one is for emergencies.  Tr. 65.  Simpson's doctor recently explained to him that he had been using the two incorrectly.  Tr. 65.  Since using them correctly, Simpson noticed that he was breathing a little better.  Tr. 65.

Simpson is able to stand only about 7-8 minutes because his knee gives out and he gets winded and lightheaded.  Tr. 57, 65.  He can sit for about two hours.  Tr. 57-58.  His legs start to go numb and he has to get up and walk around.  Tr. 65.  Simpson can bend but not all the way; he can stoop a little bit; he cannot squat.  Tr. 57.  He can pick up a coffee cup.  Tr. 57.  He can

lift a gallon of milk but his hand locks up so keeping it held and pouring the milk with one hand is difficult; he needs to use two hands.  Tr. 57, 63.  If he can get both hands around a 10 pound bag of sugar, he can lift it.  Tr. 63.  One of his fingers locks up and he has to pull it to unlock it and he has numbness and a tingling sensation in his hands.  Tr. 65-66.

Simpson stated that he smokes two or three cigarettes each day.  Tr. 59.  He acknowledged that, because of his breathing problems, smoking is not recommended.  Tr. 59.  Simpson indicated that he does not drink alcohol.  Tr. 59.  He has used cocaine and marijuana.  Tr. 59.  Simpson reported last using alcohol, marijuana, or cocaine about five months before the August 2014 hearing.  Tr. 59-60.

Simpson indicated that, because of his obstructive sleep apnea, he is up at night walking around.  Tr. 67.  He has a CPAP machine and believes that it helps some.  Tr. 67.  He indicated that he had recently been diagnosed with heart failure.  Tr. 67.  They had done some tests but were going to do some more.  Tr. 68.

Simpson's house is a two-story house with a basement.  Tr. 61.  His bedroom and bathroom are on the second floor.  Tr. 61, 64.  Simpson comes downstairs during the day and stays downstairs until late in the afternoon and then returns upstairs and does not come back down.  Tr. 64.  Simpson uses a urinal bottle during the day so he does not have to go upstairs to use the bathroom.  Tr. 64.

Simpson is able to shower and shave but he needs some assistance getting dressed.  Tr. 60-61.  Simpson is able to cook but not like he used to be able to and can do some vacuuming.  Tr. 61, 62.  Simpson's wife does the shopping; his daughter comes over to do the laundry; and his grandson mows the lawn.  Tr. 61-62.  During the day, Simpson does not do much.  Tr. 62.  Upon waking, he gets some coffee and something to eat; takes his medication; based on

instructions from his wife, he takes food out for dinner; and he attends appointments. Tr. 62.

Simpson has given up hobbies he used to like, including skating and bike riding. Tr. 62-63.

Simpson still cooks but not the way he used to enjoy doing. Tr. 62-63. Simpson attends church

and sings in the choir. Tr. 63, 66. While participating in the choir, Simpson sits most of the

time. Tr. 66.

### 2. Vocational expert's testimony

Vocational Expert Brett Salkin ("VE") testified at the hearing. Tr. 69-74. The VE

described Simpson's past work as a hospital dietary aide, indicating that the Dictionary of

Occupational Titles identified dietary aide as unskilled, medium work. Tr. 70-71. The ALJ

asked the VE to consider an individual who is 54 years old, with a 10th grade education, who can

read and write, and perform simple math, and with similar past work experience as Simpson who

is limited to light exertional work but cannot climb ladders, ropes or scaffolds; can occasionally

climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; cannot have concentrated

exposure to temperature extremes, humidity or environmental pollutants; cannot have exposure

to hazards, meaning no heights, machinery, or commercial driving; can perform simple, routine

tasks, in a low-stress environment, with no fast-paced, strict quotas or frequent duty changes; and

superficial interpersonal interactions, meaning interactions that do not require arbitration,

negotiation or confrontation. Tr. 71. The VE indicated that the described individual would be

unable to perform Simpson's past work because of the exertional limitations. Tr. 71. However,

there were jobs that the described individual could perform in the economy, including (1) food

service worker, an unskilled, light exertion job; (2) housekeeper, an unskilled, light exertion job;

and (3) sales attendant, an unskilled, light exertion job.[6] Tr. 72.

---

[6] The VE provided job incidence numbers for the identified jobs. Tr. 72.

For his second hypothetical, the ALJ asked the VE to consider the individual described in the first hypothetical with the additional limitation of being off-task at least 20% of the time.  Tr. 73.  The VE indicated that the described individual would be unable to perform Simpson's past work and there would be no other jobs available.  Tr. 73.

Simpson's counsel then asked the VE what the impact of a limitation of standing or walking for a combined 2 hours out of an 8-hour workday would be.  Tr. 73-74.  The VE indicated that such a limitation would result in a mostly sedentary RFC.  Tr. 74.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[7] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his September 8, 2014, decision, the ALJ made the following findings:[8]

1. Simpson met the insured status requirements through September 30, 2008. Tr. 29.

2. Simpson had not engaged in substantial gainful activity since July 1, 2008, the alleged onset date. Tr. 29-30.

3. Simpson had the following severe impairments: morbid obesity, hypertension (HTN), major depression, generalized anxiety disorder,

---

[7] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[8] The ALJ's findings are summarized.

personality disorder not otherwise specified, polysubstance dependence, asthma, and lumbar sprain. Tr. 30. Simpson had the following non-severe impairments: left mild carpal tunnel syndrome and obstructive sleep apnea. Tr. 30. The following conditions were non-medically determinable impairments: right carpal tunnel syndrome and a low back disorder.[9] Tr. 30-31.

4. Simpson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 31-33.

5. Simpson had the RFC to perform light work except he can never climb ladder, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; must avoid concentrated exposure to temperature extremes, humidity and environmental pollutants; must avoid all exposure to hazards, such as heights, machinery, and commercial driving; and is limited mentally to performing simple, routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes), and which requires only superficial interpersonal interactions (no arbitration, negotiation or confrontation). Tr. 34-40.

6. Simpson was unable to perform any past relevant work. Tr. 41.

7. Simpson was born in 1960 and was 48 years old, defined as a younger individual age 18-49, on the alleged disability onset date. He subsequently changed age category to closely approaching advanced age in 2010. Tr. 41.

8. Simpson has a limited education and is able to communicate in English. Tr. 41.

9. Transferability of job skills was not material to the determination of disability. Tr. 41.

10. Considering Simpson's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Simpson could perform, including food service worker, housekeeper/cleaner, and sales attendant. Tr. 41-42.

Based on the foregoing, the ALJ determined that Simpson had not been under a disability from July 1, 2008, through the date of the decision. Tr. 42.

---

[9] The ALJ indicated that all of Simpson's allegations of pain were considered in later steps in the evaluation. Tr. 31.

### V. Parties' Arguments

Simpson argues that: (1) the ALJ failed to evaluate his obesity in accordance with SSR 02-1p (Doc. 11, pp. 10-15); (2) the ALJ improperly assessed his credibility (Doc. 11, pp. 15-18); and (3) the ALJ erred by not finding him disabled as of his 50th birthday because substantial evidence supports a sedentary rather than light RFC (Doc. 11, pp. 18-20).

In response, the Commissioner argues that the ALJ properly evaluated Simpson's obesity (Doc. 15, pp. 12-17); properly concluded that Simpson was not entirely credible (Doc. 15, pp. 17-13); and the ALJ properly limited Simpson to light work and properly concluded that there were a significant number of jobs in the national economy that Simpson could perform (Doc. 15, pp. 23-24).

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.       The ALJ did not err with respect to his consideration of Simpson's obesity**

Simpson contends that, although the ALJ concluded that morbid obesity was a severe impairment, the ALJ's decision is not clear as to whether or how the ALJ considered Simpson's obesity at later steps in the sequential evaluation in accordance with SSR 02-1p. Doc. 11, pp. 10-15.

SSR 02-1p, *Evaluation of Obesity*, 2002 WL 34686281 (Sept. 12, 2002), provides that obesity will be considered by an ALJ in assessing a claimant's disability claim but SSR 02-1p does not establish a particular formula or method for evaluating obesity at each of the sequential steps in the evaluation process. *See Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411-412 (6th Cir. 2006) ("Social Security Ruling 02-01p does not mandate a particular mode of analysis."); *see also Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. 2009) ("'Social Security Ruling 02-01p does not mandate a particular mode of analysis,' but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.") (quoting and relying on *Bledsoe*, 165 Fed. Appx. at 411-412).

Contrary to Simpson's claim, the ALJ did consider obesity at later steps in the sequential evaluation process.   At Step Three, the ALJ acknowledged that Simpson had been diagnosed as obese and stated that he considered "the exacerbatory impact of [Simpson's] obese state in determining whether [his] impairments were of such severity as to meet or medically equal the relevant Listings."  Tr. 31.

Further, in assessing Simpson's credibility and formulating his RFC, the ALJ stated, "claimant's allegations of symptoms consistent with morbid obesity . . . are not accepted as alleged because those allegations are not consistent with the available objective medical evidence."  Tr. 35 (emphasis supplied).

Additionally, in discussing the consultative examiner's findings, the ALJ noted that "no range of movement limitations were noted except on flexion and extension, which were likely attributable to the claimant's obese body habitus."  Tr. 38 (emphasis supplied).

Furthermore, after discussing Simpson's treatment history and the opinion evidence in detail, the ALJ stated "[b]ased on the foregoing evidence, even after taking into account the exacerbatory impact of claimant's obese state, the undersigned is unable to conclude that the claimant, as a result of his severe impairments, is limited beyond the capacity to perform light unskilled work as defined above."  Tr. 40 (emphasis supplied).

In addition to specifically discussing Simpson's obesity, the ALJ considered and relied upon the opinion of state agency reviewing physician Dr. Green, who had considered the medical evidence, including evidence regarding Simpson's obesity, shortness of breath and pain.  Tr. 40, 90, 94-95.   Dr. Green assessed Simpson's RFC and concluded that Simpson had the ability to perform light work.  Tr. 94.  The ALJ concluded that that assessment was supported by the objective evidence and provided partial weight to that opinion. Tr. 40.   The ALJ's consideration

of and reliance on Dr. Green's medical opinion further demonstrates that the ALJ considered Simpson's obesity when evaluating Simpson's disability claim throughout the sequential evaluation process. *See Bledsoe*, 165 Fed. Appx. at 412 (When an ALJ credited a physician's report that considered claimant's obesity, it was clear that the ALJ had considered the claimant's obesity.).

Based on the foregoing, the undersigned concludes that, when assessing Simpson's RFC, the ALJ considered and took into account Simpson's obesity and Simpson has not shown that the RFC is not supported by substantial evidence or that his obesity alone, or in combination with other impairments, required limitations beyond those contained in the RFC.  In fact, Simpson points to no treating or examining physician who has opined that functional limitations beyond those included in the RFC are required to account for his impairments.  Furthermore, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a); 20 C.F.R. § 404.1546(c).  Simpson has not shown that the ALJ failed to comply with these Regulations nor has he shown that the ALJ failed to consider Simpson's obesity in accordance with SSR 02-1p.

Accordingly, based on the foregoing, the undersigned recommends that the Court find no error with respect to the ALJ's consideration of Simpson's obesity.

### B.  The ALJ properly assessed Simpson's credibility

Simpson acknowledges that the ALJ provided specific reasons for finding him not credible but contends that the ALJ's reasons are not supported by substantial evidence.  Doc. 11, pp. 15-18.

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").  "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Consistent with the Regulations, the ALJ considered Simpson's allegations that he was unable to work due to various impairments and symptoms, including his morbid obesity, hypertension, asthma, shortness of breath, and ongoing fatigue.  Tr. 34.

Further, consistent with the Regulations, the ALJ considered objective evidence as well as other evidence to assess the credibility of Simpson's allegations. Tr. 34-34.

For example, he considered objective medical findings that were not consistent with Simpson's disabling complaints. Tr. 35-38. Also, in assessing Simpson's credibility, the ALJ considered Simpson's attempts to seek employment. Tr. 39. Simpson challenges the ALJ's reliance on his attempts to find work, arguing that Simpson's attempts to find work served to bolster his credibility. Doc. 11, p. 16. Simpson's argument amounts to a request that this Court weigh and consider the evidence de novo. However, it is not for this Court to "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987). Furthermore, the ALJ did not rely upon Simpson's job seeking activity to conclude that Simpson could in fact work. The ALJ recognized that a claimant could be found disabled while seeking employment but, when assessing the credibility of Simpson's allegations, the ALJ properly considered Simpson's job seeking activity as one of many different activities that Simpson engaged in. *See e.g., Spencer v. Comm'r of Soc. Sec.*, 2013 WL 5507332, * 7 (N.D. Ohio Oct. 2, 2013) (finding no error with ALJ's credibility assessment where claimant's job seeking activity was one of various activities that the ALJ found inconsistent with the claimant's subjective complaints of disabling limitations).

For example, the ALJ also considered that Simpson cared for his young grandchildren, joined a church choir, participated in strength training as part of VA MOVE class, and acted as primary caregiver for his brother who had become very ill. Tr. 37, 38-39, 40. Simpson contends that the ALJ did not accurately represent his testimony regarding his daily activities and his daily activities were more limited than the ALJ described. Doc. 11, pp. 16-17. As indicated, it is not for this Court to try the case de novo. Furthermore, there is no indication that the ALJ ignored

evidence.  For example, Simpson points out that he was limited in his ability to perform chores and go up and down the stairs during the day.  Doc. 11, p. 17.  However, the ALJ considered this evidence, noting that Simpson testified that he spent the majority of the day in a recumbent position and avoided going up and down stairs and performing chores.  Tr. 34.

Simpson also takes issue with the ALJ's reliance on his participation in MOVE classes at the VA because his participation was very limited.  Doc. 11, p. 17.  However, Simpson's participation in MOVE classes was not the only activity that the ALJ considered when assessing Simpson's credibility.

Simpson also suggests that he did not regularly care for his grandchildren, arguing that he testified that his grandchildren visited on the weekends.  Doc. 11, pp. 16-17.  However, there is other evidence in the record showing that Simpson was in fact caring for his grandchildren, not just having them visit on weekends.  *See e.g.,* Tr. 37-38, 68 (hearing testimony reflecting that Simpson walked his grandchildren to nursery school), Tr. 571 (December 14, 2012, medical record reflecting that Simpson reported being stressed out much of the time taking care of his 3 and 5 year old grandchildren).  Furthermore, in addition to caring for his grandchildren, Simpson cared for his ailing brother.  *See e.g,* Tr. 39, 658 (June 16, 2014, medical record reflecting that Simpson reported that he was the primary caregiver for his brother).

The ALJ also took into consideration the fact that there were periods of non-compliance and lack of follow up by Simpson regarding his impairments.  Tr. 30 (noting non-compliance with CPAP machine); Tr. 35-36, 59 (noting Simpson continued to smoke notwithstanding recommendations to stop); Tr. 39 (noting lack of compliance and gaps in treatment).

The foregoing demonstrates that the ALJ did not limit his credibility assessment to one piece of evidence.  Rather, he considered Simpson's allegations and assessed the credibility of

those allegations in light of the evidence of record.  Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Simpson's impairments is supported by substantial evidence.  Accordingly, the undersigned recommends that the Court reject Simpson's request to reverse and remand the Commissioner's decision on the basis of the ALJ's credibility assessment.

## C.    The ALJ did not err at Step Five and/or in finding Simpson not disabled at age 50

In his third argument, Simpson contends that the evidence supports a sedentary RFC and that, had the ALJ reached that conclusion, the Grid Rules[10] would have directed a finding of disabled once Simpson reached the age of 50.  Doc. 11, pp. 18-20.  Specially, Simpson points to Grid Rules 201.09 and 201.10.  Doc. 11, p. 18.  An individual age 50-54 is considered a "[p]erson closely approaching advanced age."  20 C.F.R. § 404.1563(d).  Grid Rule 201.09 directs a finding of disabled where an individual is closely approaching advanced age, is limited to sedentary work, has a limited or less education, and who has unskilled or no past work experience.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 2.  Grid Rule 201.10 directs a finding of disabled where an individual is closely approaching advanced age, is limited to sedentary work, has a limited or less education, and who has past work experienced that involves non-transferable skilled or semiskilled-skills.  *Id.*

Simpson's third argument amounts to a challenge to the ALJ's RFC assessment based on his earlier arguments regarding the ALJ's consideration of his obesity and assessment of his credibility.  Doc. 11, pp. 18-20.  However, as discussed above, the ALJ found Simpson's

---

[10] The Medical-Vocational Guidelines, known as the "Grid," are located at 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grid"). The Grid is composed of Rules 200.01-204.00. *Id.*  The Grid includes rules that may be applied in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work.  20 C.F.R. § 404.1569.  However, the rules contained in the Grid do not cover all possible variations of factors. *Id.*

subjective claims not fully credible and that determination is supported by substantial evidence. Also, as discussed above, the ALJ properly considered Simpson's obesity in combination with his other impairments. Furthermore, Simpson points to no opinion evidence setting forth functional limitations beyond those found by the ALJ and the ALJ's light RFC is supported by the opinion of state agency reviewing physician Dr. Green. Tr. 40, 94.

Based on the foregoing, the undersigned finds that Simpson has not shown that the RFC as assessed by the ALJ is not supported by substantial evidence. Further, since the RFC limited Simpson to light, rather than sedentary, work, the Grid Rules 201.09 and 201.10 were not applicable and the ALJ did not err in relying on the VE's testimony to support his Step Five finding that there was work in the national economy that Simpson could perform. Accordingly, the undersigned recommends that the Court find no error with respect to the ALJ's Step Five finding and/or no error with respect to the ALJ not finding Simpson disabled at age 50.

### VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

January 5, 2017

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).